IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

George J. Smith,                    :

      Plaintiff,              :

      v.                      :      Case No. 2:10-cv-58

Commissioner of Social             :      JUDGE WATSON
Security,                          MAGISTRATE JUDGE KEMP

      Defendant.              :

<u>REPORT AND RECOMMENDATION</u>

I.  <u>Introduction</u>

Plaintiff, George J. Smith, filed this action seeking review
of a decision of the Commissioner of Social Security denying his
application for a period of disability and social security
disability benefits.  That application was filed on October 3,
2006, and alleged that plaintiff became disabled on February 1,
2005.

After initial administrative denials of his claim, plaintiff
was given a hearing before an Administrative Law Judge on March
24, 2009.  In a decision dated May 13, 2009, the ALJ denied
benefits.  That became the Commissioner's final decision on
November 24, 2009, when the Appeals Council denied review.

After plaintiff filed this case, the Commissioner filed the
administrative record on March 22, 2010.  Plaintiff filed his
statement of specific errors on July 19, 2010.  The Commissioner
filed a response on September 22, 2010, and plaintiff replied on
October 13, 2010.  The case is now ready to decide.

II.  <u>Plaintiff's Testimony at the Administrative Hearing</u>

Plaintiff's testimony at the administrative hearing is found
at pages 22 through 52 of the record.  The following is a summary
of the facts to which plaintiff testified.

Plaintiff was born in 1963 and was 45 years old as of the date of the hearing.  He completed 10 years of school and does very little reading.  He can do some basic addition and subtraction.  At the time of the hearing, he was receiving workers' compensation benefits.  Most of his past work was as a laborer for different employers.

Plaintiff was involved in an accident at work in August of 2004.  He was standing in the back of a truck when it was bumped by another truck and he fell, landing on some steel forms. Eventually, he underwent back surgery after suffering from constant pain from the date of the accident until the date of the surgery in 2006.  He had been suffering from pain in both his back and legs, and his legs would give out and he would fall.

Plaintiff testified that his pain has worsened since his surgery.  There are days when he is unable to get out of bed. The pain goes down both of his legs as far as his ankles.  He had to wear a bone growth stimulator for a year after the surgery. Eventually, he stopped seeing his back surgeon and was referred to a pain management specialist.  The specialist gives him steroid injections as well as medication.  He has also been seeing a psychologist for depression.

Most days, plaintiff stays at home.  He will occasionally go to the store but cannot walk around a grocery store without stopping to rest.  He does no household chores other than cooking occasionally, and he leaves the television set on for background but does not watch it.  He can sit for approximately 20 minutes at a time and then needs to stand for three or four minutes before sitting back down.  He can walk half a block and can lift a gallon of milk.  His pain is severe every day, and his pain medications are generally effective for only an hour after he takes them.

### III.  The Medical Evidence

On March 7, 2005, plaintiff was seen at the emergency room complaining that his left leg had been giving out since he suffered a work-related back injury in August of 2004.  As of the March 7, 2005 visit, he was experiencing pain on the left side of his lower back radiating down his left leg with numbness in the left leg.  He was discharged in good condition with a final diagnosis of lumbar back pain with radiculopathy.  He was given medication to treat his symptoms.  (160-66).

A number of notes from Grandview Family Practice are found in the administrative record at pages 172-209.  They cover a time period from 2004 to 2006.  Generally, they show treatment of back pain from August of 2004 forward.  A note from January 6, 2005 indicated that plaintiff was working but was in a winter layoff. At that time, he reported his back pain to be severe and he was suffering from lumbar spasms and a decreased range of motion. His medication was consistently renewed while he was awaiting approval for back surgery.  His medications included Vicodin (prior to surgery) and OxyContin afterward.  The notes indicate that the surgery was performed on May 30, 2006 and that he was then seen for post-operative care.  As of November 1, 2006, his medication levels had been lowered and his fusion was reported as doing well.  He was wearing a bone growth stimulator at the time

The records also include a discharge summary from Grant Medical Center concerning plaintiff's back surgery.  According to that summary, his admitting diagnosis was back pain and lumbar instability due to disc herniation at L4-5, L5-S1.  He underwent a decompressive lumbar laminectomy and excision of a herniated disc at two levels along with fusion and pedicle screw fixation. He was discharged in stable condition two days following surgery with a list of medications to take.  At that time he was walking without difficulty.  He was directed to follow up with his surgeon, Dr. White, in two weeks.  (Tr. 218-19).  One of the

-3-

tests which apparently led to the recommendation for surgery was an MRI performed on February 2, 2005 which showed disc desiccation and a broad-based central disc herniation at L4-5 and similar but less severe findings at L5-S1.  (Tr. 232). Additionally, the record contains a number of notes from Dr. White beginning in April, 2005 supporting his recommendation for surgery and showing that plaintiff was suffering from severe back pain as well as a drop foot.  (Tr. 251-55).

Plaintiff saw Dr. White three weeks later.  He was using a walker at that time but his gait was normal.  He reported some hip pain and intermittent leg pain along with back spasms.  He was not generally compliant with instructions about wearing the bone growth stimulator.  Most objective tests were normal, and the plan was gradually to wean him off narcotics.  (Tr. 242-43).

Approximately six weeks after his surgery, plaintiff was seen at the Grant Medical Center emergency room complaining of shooting pain in his lower back and legs.  Plaintiff had been prescribed Neurontin but had not been taking it.  He was directed to do so and to follow up with his primary physician.  (Tr. 216-17).  Various follow-up notes from Dr. White show that on July 24, 2006, plaintiff was having increased leg pain (which appeared to be out of proportion to physical examination) and that he was showing signs of severe narcotic dependence; on August 25, 2006, his leg pain had improved but he was still on "quite a bit of narcotic analgesics" and was walking without difficulty; on September 14, 2006, he was asking for more OxyContin as a result of having taken more than the prescribed amount and was again reporting subjective pain out of proportion to objective findings; and on October 30, 2006, the situation was similar and plaintiff was somewhat noncompliant with his bone stimulator usage.  (Tr. 234-41).  During this same time period, Dr. Perkins did an evaluation for purposes of plaintiff's workers'

-4-

compensation claim and concluded that due to the recency of the surgery and plaintiff's continued complaints of pain, he could not return to any productive work at that time.  (Tr. 310-14).

A state agency reviewer, Dr. Das, reviewed the medical records and, on December 4, 2006, expressed the opinion that plaintiff could perform a limited range of light work (she imposed some postural limitations).  She also commented that his subjective statements about the severity of his symptoms and limitations were "supported in nature but not in severity."  (Tr. 256-63).  Another state agency physician, Dr. McCloud, subsequently affirmed Dr. Das' opinions.  (Tr. 280).

Plaintiff was at some point referred to a pain care specialist, Dr. Katabay.  On October 6, 2006, Dr. Katabay reported that plaintiff's chief complaints were lower back pain and neck pain but that he had been having bilateral leg pain as well following surgery.  He was walking with a slow shuffling gait and straight leg raising was positive.  The impression was lumbar sprain/strain and plaintiff was given a TENS unit and some additional medications.  On December 5, 2006, Dr. Katabay performed a caudal epidural steroid injection, and performed another such injection two weeks later, followed by a third on January 2, 2007.  According to a note of January 26, 2007, plaintiff's pain returned shortly after the injections, and he had not improved when seen again on February 23, 2007.  (Tr. 266-76).  He had another series of injections, in the sacroiliac joint, in 2007, but according to Dr. Katabay he was still experiencing persistent low back pain.  (Tr. 298-303).

Plaintiff underwent both a lumbar myelogram and a CT scan on December 14, 2006.  Those tests revealed an extradural defect at L4-5 which appeared to be a disc protrusion resulting in effacement of the right L5 nerve root.  The prior laminectomy appeared to be uncomplicated, however.  (Tr. 277-78).

Plaintiff was examined by Dr. Levy on January 19, 2007, for purposes of plaintiff's workers' compensation claim.  Plaintiff reported that not only did surgery not improve his condition, but he might be worse.  He was reporting increasing pain and diminished walking tolerance.  He demonstrated pain throughout his entire low back even on light palpations.  However, his strength and reflexes were normal.  Dr. Levy thought that even though plaintiff was still healing from his surgery, he could return to sedentary or light duty with a lifting restriction of 15 pounds.  He also thought that a greater effort should be made to wean plaintiff off his opiod medications.  (Tr. 291-93).

Plaintiff was also evaluated by Dr. Vazin, an orthopedic surgeon, on August 22, 2007.  At that time, plaintiff was reporting continued aching discomfort in his low back with bilateral leg weakness, but denied any numbness or tingling in his legs.  He could rise from a seated position without any difficulty and his gait was slow but steady.  He resisted manipulation of his spine and hips as well as passive extension of his legs.  There were no true signs of radiculopathy. Objective tests showed no cause for his subjective complaints. Dr. Vazin commented that "subjectively," plaintiff could not return to productive work at any level, but that objectively he should be able to do at least sedentary work.  He also pointed out the need to wean plaintiff off his narcotics and thought that plaintiff should do home strengthening exercises and undergo vocational rehabilitation.  (Tr. 294-96).  Dr. Perkins did a similar evaluation on October 27, 2008, and concluded that plaintiff could do a sedentary or light duty job.  (Tr. 306-09).

Finally, Dr. Levy evaluated plaintiff again on May 7, 2009, and concluded that based on an evaluation done by Dr. Serednesky, a psychologist, plaintiff was suffering from major depression, single episode, of moderate severity, and that this condition was

-6-

also related to his work injury.  Dr. Levy thought that condition prevented plaintiff from working.  (Tr. 324-25).  This opinion (Exhibit 19F) was apparently submitted only as part of the Appeals Council review process and was not before the ALJ.  (Tr. 5).

> ### IV.   The Vocational Expert's Testimony

A vocational expert, Mr. Pinti, testified at the administrative hearing.  His testimony begins on page 52 of the administrative record and continues through page 59.

Mr. Pinti identified plaintiff's past work as a paving laborer, a roll tender, and a construction laborer.  All of those jobs are considered to be very heavy in exertional level.  One of them was semiskilled and the other two were unskilled.  Mr. Pinti was asked to consider the work ability of a person who can lift up to 20 pounds occasionally and 10 pounds frequently and who could stand, sit, or walk for approximately 6 hours during a workday.  That person also could not climb ladders, ropes, or scaffolds and could occasionally climb ramps or stairs, balance, stoop, crouch, kneel, and crawl.  Mr. Pinti testified that such a person could not do any of plaintiff's past work but could do a number of unskilled jobs at the light exertional level.  If the same person could work at only the sedentary level, there would be unskilled sedentary jobs which that person could perform. Some of those jobs could be performed by someone who was limited to simple, routine, repetitive tasks performed in a low stress environment where only occasional decision-making was required and only occasional changes in the work setting would occur. Jobs such as inspector and sorter would be included within this category.  However, if the person under consideration had the same limitations to which plaintiff testified, that person could do no work at all.

> ### V.   The Administrative Law Judge's Decision

The administrative decision appears at pages 10 through 21 of the administrative record.  The important findings in that decision are as follows.

First, the Administrative Law Judge found that plaintiff was insured for purposes of social security disability insurance only through September 30, 2008.  Second, the ALJ found the plaintiff had not worked from February 1, 2005, his alleged onset date, through his last insured date.  Third, the ALJ concluded the plaintiff suffered from severe impairments including herniated discs at the L4-5 and L5-S1 levels and that he was status post decompression, lumbar laminectomy, and lumbar fusion with fixation.  Plaintiff also suffered from degenerative disc disease of the cervical spine and a dysthymic disorder, both of which were considered to be severe.  The ALJ believed that the record suggested he suffered from obstructive airway disease and had hepatitis A but these were not severe.

The ALJ analyzed the severe impairments, both physical and psychological, in light of the Listing of Impairments and found that none of them satisfied the criteria found in the Listing. Next, the ALJ found that plaintiff could still perform sedentary work which did not require him to climb ladders, ropes or scaffolds or to climb ramps or stairs more than occasionally. Also, he could only occasionally balance, crawl, kneel, crouch, or stoop.  From a psychological standpoint, he could do a job where the tasks required were simple, routine, and repetitive, and which required only occasional decision-making and involved only occasional changes in the work setting.  Further, he was limited to jobs which did not have strict time or production requirements.  The ALJ based this finding on a number of factors, including statements from three physicians that plaintiff could do sedentary work and the fact that, on many occasions, the symptoms which he reported to his doctors appeared to be

-8-

exaggerated or out of proportion to the physical findings produced by examinations or clinical or laboratory tests.  There was also some suggestion that he reported more severe symptoms in order to obtain narcotic medications.

Finally, the administrative decision addressed the question of whether plaintiff, who is a "younger individual" as defined in the applicable regulation, could still perform substantial gainful activity.  The ALJ noted that under the medical-vocational guidelines, someone of plaintiff's age, education, and work experience who could perform only sedentary work was considered to be "not disabled."  Taking plaintiff's psychological limitations into account, as well as other non-exertional limitations, the vocational expert had testified that plaintiff could do a number of sedentary jobs such as inspector and sorter.  The ALJ found that these jobs existed in significant numbers in the regional and national economies and concluded that plaintiff did not meet the statutory definition of "disabled."  His application for benefits was therefore denied.

VI.  Plaintiff's Statement of Specific Errors

In his statement of specific errors, plaintiff advances three reasons why the Court should either reverse the decision of the ALJ or remand the case for further proceedings.  First, he argues that a medical advisor should have been called to testify at the administrative hearing, specifically on the issue of whether plaintiff was disabled for a period of time while he was waiting for and recovering from surgery.  Second, he asserts that the ALJ should have accepted his testimony about the extent of his pain and found him disabled as a result.  Third, he argues that the evidence which he submitted with his statement of errors, none of which was submitted to the ALJ or the Appeals Council, shows that he has additional medical conditions which were probably present during the period of time under

consideration, and that the case should therefore be remanded so that the ALJ can consider the significance of these conditions. The Court will address each of these issues in the order in which they have been raised.

A. <u>Failure to Call a Medical Expert</u>

Plaintiff's first claim is that the ALJ should have called a medical expert to testify at the administrative hearing on the issue of whether plaintiff was disabled for at least a twelve-month period before and after his back surgery.  He claims that such an expert might well have testified that his back impairment was sufficiently severe to meet the requirements of the Listing of Impairments for that time period and that it was error for the ALJ to make that finding himself.

As the court observed in <u>Griffin v. Astrue</u>, 2009 WL 633043 *10 (S.D. Ohio March 6, 2009), "[t]he primary function of a medical expert is to explain, in terms that the ALJ, who is not a medical professional, may understand, the medical terms and findings contained in medical reports in complex cases."  Whether to call such an expert to testify is generally left to the discretion of the ALJ, <u>see id., quoting Haywood v. Sullivan</u>, 888 F.2d 1463, 1467-68 (5th Cir. 1989), and the Court may overturn the exercise of that discretion only if it appears that the use of a medical consultant was necessary - rather than simply helpful - in order to allow the ALJ to make a proper decision. <u>See Landsaw v. Secretary of Health and Human Services</u>, 803 F.2d 211, 214 (6th Cir. 1986), <u>quoting Turner v. Califano</u>, 563 F.2d 669, 671 (5th Cir. 1977).

Here, there was evidence in the record (the opinion of Dr. Das, as affirmed by Dr. McCloud) that plaintiff's impairment did not meet any applicable section of the Listing of Impairments. Those opinions were rendered following his surgery and included a review of medical records created both prior to and after the

-10-

surgery.  None of the other records contained findings that
appear to coincide with the specific requirements of any
particular Listing, and plaintiff does not identify - either in
his statement of errors or his reply brief - any listed
impairment by number.  Rather, he argues only that from February
1, 2005, the date that surgery was recommended, up to a
reasonable date after the surgery, which occurred in May, 2006,
it is "likely" that he satisfied the "listing for disorders of
the spine."  Reply brief, Doc. # 19, at 2.  Assuming this to be a
reference to Listing 1.04, plaintiff has not pointed to evidence
from which a reasonable person could have concluded that all of
the requirements of this Listing (including "neuro-anatomic
distribution of pain, limitation of motion of the spine, motor
loss (atrophy with associated muscle weakness or muscle weakness)
accompanied by sensory or reflex loss and, if there is
involvement of the lower back, positive straight leg raising test
(sitting or supine)") were satisfied.  See Listing 1.04(A).
There is even less reason to believe that he might have satisfied
the other two subsections of this Listing.  In short, it was not
necessary, given the state of the record, for the ALJ to consult
with a medical expert on this issue, and the failure to have done
so does not form a basis for reversing or remanding the case.

        B.  Not Accepting Plaintiff's Testimony

     Plaintiff's second argument relates to his testimony which,
if fully credited, would show that he cannot work.  He argues
that it is now clear from Dr. Levy's report that his pain has
caused him to suffer from debilitating depression, and that he
also suffers from pseudoarthrosis and chronic narcotic dependency
which, in his view, corroborate his testimony concerning
debilitating pain.  He suggests that a remand is needed to allow
the ALJ to take these conditions into account.

     It is not entirely clear if this second issue is part of the

-11-

third issue raised - that a remand to consider new and material evidence is warranted - or an attack on the actual credibility finding made by the ALJ based on the record which was before him when he made his decision.  To the extent that it is the former argument, the Court will consider it more fully below.  To the extent that it is the latter, the ALJ is entitled to make reasonable determinations as to a claimant's credibility and those determinations are generally not subject to reversal unless the ALJ either fails to give any reason at all for not fully crediting the claimant's testimony, or gives reasons which are improper or insufficient.  See generally Walters v. Commissioner of Social Security, 127 F.3d 525, 531 (6th Cir. 1997) (an "ALJ's findings based on the credibility of the applicant are to accorded great weight and deference" although "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence").

Here, plaintiff makes only a vague argument that the ALJ improperly discounted his report of debilitating pain.  The ALJ, however, did give some weight to plaintiff's testimony, rejecting the opinions of the state agency physicians that plaintiff could do light work, and limiting him to the performance of sedentary work.  The administrative decision is replete with findings that plaintiff apparently reported pain out of proportion with any objective findings and that the doctors who treated him expressed the opinion that, even given his reports to them of disabling pain, he could do some type of work.  This is a fair reflection of the medical evidence itself as discussed in Section III of this Report and Recommendation.  Consequently, the ALJ did cite to valid reasons for concluding that plaintiff was not totally believable and that he did have the ability to do at least sedentary work with some postural restrictions.  A reasonable person could have reached the same conclusion on this record.

-12-

Given the "substantial evidence" test that applies here, <u>see,</u>
<u>e.g., Kirk v. Secretary of Heath and Human Services</u>, 667 F.2d
524, 535 (6th Cir. 1981), that is all that is needed to affirm
the Commissioner's finding on this issue.

    C. <u>Remand Based on New and Material Evidence</u>

  Plaintiff's third and final argument is that the case should
be remanded to the Commissioner for consideration of additional
evidence.  Such a remand is permitted under 42 U.S.C. §405(g),
sentence six, but the additional evidence supporting this type of
remand must be both "new" and "material," and there must be a
showing of good cause as to why it was not submitted in
connection with the prior administrative proceedings.  Any new
evidence must be relevant and probative and must be of such a
nature that there is a reasonable chance that the Commissioner
would reach a different conclusion after considering it.  <u>See</u>
<u>Chancey v. Schweiker</u>, 659 F.2d 676 (5th Cir. 1981); <u>Thomas v.</u>
<u>Schweiker</u>, 557 F.Supp. 580 (S.D. Ohio 1983).  At a minimum, the
new evidence must relate to a condition which affected the
plaintiff's ability to work at the time the administrative
decision was made.  Evidence concerning a newly-developed
medical condition is not ordinarily relevant to the question
of whether the plaintiff was disabled at the time the
Secretary's decision was entered.  <u>Oliver v. Secretary of</u>
<u>H.H.S.</u>, 804 F.2d 964 (6th Cir. 1986).

  Here, the report of Dr. Levy discussed in the previous
section is one piece of new evidence.  That document is already
in the record.  Plaintiff has also attached additional documents
to his statement of errors.  They include a CT scan done on
October 13, 2009, which showed, among other things, a lucency
about the fusion cage at the L5-S1 level suggestive of
pseudoarthritis; a report from Dr. Mavian, a spinal surgeon,
interpreting the CT scan as showing a "less than satisfactory

-13-

fusion at L5-S1" and diagnosing chronic pain syndrome with chronic narcotic dependency, as well as some additional disc disease at L3-4; a letter from Dr. Guluzian dated April 27, 2010, stating that plaintiff's narcotic dependency is necessitated by his level of pain; and a psychiatric evaluation done by Dr. Youngman, a psychiatrist, who noted plaintiff's withdrawal from social activities after his injury and who diagnosed major depression with psychotic features.  There are also other records or comments dealing with the extent to which, for workers' compensation purposes, these conditions are related to his industrial accident.

In response to this argument, the Commissioner points out that plaintiff's last insured date was September 30, 2008, and that all of the new evidence which he proffers postdates that date by at least nine months.  Further, none of these reports contains any information about plaintiff's ability to do work-related activities at any time, whether before or after September 30, 2008.  In contrast, the ALJ had before him evidence from a number of doctors which supported a finding that plaintiff could do sedentary work as of that date.  Thus, the Commissioner argues that this evidence would not be reasonably likely to alter the decision which has already been made.

As to his back condition, plaintiff argues that the pseudoarthritis shown on the latest CT scan must have existed prior to his last insured date because it represents unfused bones, and therefore indicates that the spinal fusion was not successful from its inception in May, 2006.  He appears to argue that there were no other objective studies done post-surgery that would have revealed this condition.  However, the record does contain evidence of both a myelogram and a CT scan performed on December 14, 2006, which were not interpreted as showing this condition.  Further, the presence or absence of a medical

-14-

condition is not determinative of its impact on a claimant's
ability to do work.  Even if plaintiff had this condition, it was
the opinion of many of the doctors who treated him for his
complaints of back pain from 2006 to 2008 that he could do a
sedentary job.  Nothing in the additional exhibits which he
submitted address this issue at all.  Therefore, the Court agrees
with the Commissioner that these documents, standing alone, would
not likely have an impact on the decision that plaintiff could do
sedentary work until at least September 30, 2008.

The evidence as to his psychological condition is not
substantially different.  The only condition diagnosed prior to
September 30, 2008 was a dysthymic disorder.  Although Dr. Levy
disagreed with this diagnosis, he is neither a psychologist nor a
psychiatrist.  Dr. Youngman, who is a psychiatrist, evaluated
plaintiff only once, as did Dr. Serednesky, and Dr. Youngman's
evaluation took place almost eighteen months after plaintiff's
insured status expired.  Again, Dr. Youngman did not express any
view on how limited, if at all, plaintiff is (or was) from a
psychological standpoint, and he commented that plaintiff's
insight and judgment were fair to moderate, his memory was
intact, and his general fund of knowledge seemed adequate.  The
ALJ already imposed various psychological restrictions in his
residual functional capacity finding, and there is nothing to
indicate that Dr. Youngman believed plaintiff was any more
restricted than the ALJ found.  Again, given the applicable legal
standard, which is that this new evidence, in order to be deemed
"material," must have the tendency to change the existing
decision, the Court is unable to conclude that it would likely do
so.  Therefore, a sentence six remand would be inappropriate.

## VII.  Recommended Decision

For all of the reasons stated above, it is recommended that
the plaintiff's statement of specific errors (Doc. #14) be

overruled and that the Court enter judgment in favor of the defendant Commissioner of Social Security.

VIII.   <u>Procedure on Objections</u>

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation <u>de novo</u>, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  <u>See Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir. 1981).


<u>/s/ Terence P. Kemp</u>
United States Magistrate Judge